## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **AUTO-OWNERS INSURANCE COMPANY,** | |
| **Plaintiff,** | |
| **v.** | |
| **EXCELSIOR WESTBROOK III, LLC,** | |
| **Defendant.** | |
| | **Case No. 2:22-cv-02360-HLT** |
| **EXCELSIOR WESTBROOK III, LLC,** | |
| **Counter Plaintiff,** | |
| **v.** | |
| **AUTO-OWNERS INSURANCE COMPANY,** | |
| **Counter Defendant.** | |

## MEMORANDUM AND ORDER

Excelsior Westbrook III, LLC ("Owner") owns a building that was significantly damaged by water after a pipe under the building broke. The building was covered by an insurance policy issued by Auto-Owners Insurance Company ("Insurer"). Insurer denied coverage for the loss because the policy excluded losses caused by water under the ground surface that presses on, flows through, or seeps through the foundation, floors, basement, walls, doors, or windows of the building. Insurer filed this lawsuit seeking declaratory judgment on that point.

Owner counterclaimed for breach of contract based on Insurer's failure to pay under the policy and for violation of the Kansas Uniform Trade Practices Act ("KUTPA"). Owner contends that Insurer cannot meet its burden of proving the exclusion relied on applies because the pipe was

not "under the ground surface," because the exclusion is ambiguous, and because a different provision of the policy provides coverage.

Both parties move for summary judgment on their claims. The dueling claims for declaratory judgment and breach of contract both turn on whether Insurer can establish that the loss is excluded under the policy. Because the Court finds that Insurer has shown an exclusion applies based on the undisputed facts, it grants summary judgment in favor of Insurer on the issue of coverage. Because Owner does not challenge Insurer's motion on the KUTPA claim, the Court grants Insurer summary judgment on that claim as well.

## I.   BACKGROUND[1]

### A.   Broken Pipe and Subsequent Water Damage

Insurer issued an insurance policy to Owner for a building located at 8050 Marshall Drive in Lenexa, Kansas. PSOF 1-2; DSOF 1. On July 21, 2022, Owner's building sustained damage when a water pipe ruptured. PSOF 3. The parties agree that the pipe supplied water to the building's fire suppression system but dispute whether it was "part" of the fire suppression system. *See* DSOF 1, 5 (including response); *see also* PSOF 8-9.[2]

The break in the pipe was underneath the floor of a stairwell and was within the footprint of the building. DSOF 9 (including response). The parties disagree on whether the pipe can be characterized as "underground," but this seems to be a dispute about the legal significance of that description. *See* PSOF 3. (including response stating: "[c]ontroverted that the pipe was

---

[1]   A court views each motion separately in a light most favorable to the non-moving party when parties file cross-motions for summary judgment. *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 906-07 (10th Cir. 2016). With this standard in mind, the following facts are uncontroverted except where otherwise noted. Citation to "DSOF" refers to the statement of facts in Owner's amended memorandum in support of its motion. Doc. 95. Citation to "PSOF" refers to the statement of facts in Insurer's memorandum in support of its motion. Doc. 92.

[2]   Insurer contends the building's fire suppression system begins "above the flange" where the municipal water system enters the building. Owner argues the pipe "was a private line, installed as part of the fire suppression system, and was original to the building." *See* PSOF 9 (including response).

'underground' as it was part of the original construction and infrastructure of the building and part of the building's fire suppression and/or plumbing systems"). It seems uncontroverted (and obvious from the pictures) that the pipe was literally under the ground, or at least "several feet beneath the floor," and that excavation was required to access it, including removal of the concrete floor, dirt, clay, and rocks. PSOF 6 (including response). It is uncontroverted that this picture "shows the pipe's location in relation to the floor of the building and the excavation to reach the pipe."



PSOF 7. Owner also acknowledged in an email to its members that the pipe was "directly under the building." PSOF 22. The pipe at some point ran beneath the footings of the building, but it's not clear where the break was located with regard to the footings. PSOF 4 (including response).

The parties ostensibly dispute whether water from the broken pipe "seeped up" through the foundation or floor. *See* PSOF 5 (including response). Insurer maintains that "[a]s a result of the pipe's failure, water seeped up through the floor and into the building." *Id.* Owner disputes that and states there "is no evidence that the water 'seeped up' through the floor." *Id.* (including

response). The testimony cited by Insurer on this point indicates that water was observed coming from under doors, Doc. 92-1 at 6 (White Dep. 14:3-14), that there was three inches of water throughout the first floor, *id.* (White Dep. 15:13-22), that water was in the building when a pipe under the concrete slab broke, *id.* at 7 (White Dep. 18:9-24), that "[t]here was a huge hole in the ground where the water had blew out" and digging was needed to make a repair, Doc. 92-2 at 4 (Quirk Dep. 11:19-12:2), and that a picture showed where "the water came out of the floor," *id.* at 5 (Quirk Dep. 14:1-8). In support of the contention there is no evidence that water "seeped up," Owner cites deposition testimony about the investigation that was done by Insurer, Doc. 86-11 at 12-13, and testimony by Bob Quirk, the plumber who did the repairs, which includes the statement that "[t]here was a huge hole in the ground where the water had blew out," Doc. 86-4 at 4. Quirk also testified that "the floor had heaved" when the pipe broke, and that "if you've ever seen a water main break, it blows it right out of the ground." *See id.*[3]

Regardless, it is undisputed that the building sustained damage after the pipe broke. Specifically, water from the broken pipe caused damage to the building's entire first floor. DSOF 6. Owner reported the loss the same day. PSOF 10; DSOF 2. A representative of the building's management company was responsible for overseeing and coordinating repairs. DSOF 3-4. Owner retained ZIPCO as a general contractor to provide mitigation and repairs. PSOF 14; DSOF 7 (including response). Invoices for restoration and repairs totaled $1,746,003.36, which Owner paid. DSOF 8.

Insurer began investigating the loss by contacting the property manager. PSOF 11. A ZIPCO representative sent Insurer a photograph of the pipe. PSOF 15. Insurer sent a reservation

---

[3]   Owner only cites to the PDF page number of the deposition exhibits, which each contain four pages of deposition testimony. There are no cites to specific testimony, leaving the Court to guess at the specific testimony being relied on. The testimony cited above is found on the cited PDF page.

of rights letter on July 25, 2022, and indicated there were potential coverage issues. PSOF 12-13; DSOF 17. Insurer did not make any determination as to the cause of the broken pipe, i.e. why the pipe failed. DSOF 13 (including response). The parties dispute the manner in which Insurer investigated the claim. Owner generally alleges Insurer did not independently investigate or hire anyone to independently investigate the broken pipe. Insurer contends it investigated by gathering information from the property manager, the contractor, and the insurance broker, and by reviewing photographs. *See* DSOF 14-16 (including responses). The field adjuster assigned by Insurer never went to the building to investigate the loss in person. DSOF 15.

Between July 26, 2022, and August 18, 2022, the parties[4] discussed coverage for the loss. PSOF 18. On August 12, 2022, Insurer issued a letter denying coverage, citing a water exclusion in the policy as the reason. DSOF 18; PSOF 19, 21.

As a result of the denial, Owner did not have the capital to pay for the repairs to the building. DSOF 20. It had to quickly request capital. DSOF 21 (including response). The interest rate for the promissory notes was 20%. *See* DSOF 22 (including response). The parties dispute whether this rate was dictated or negotiated. *See id.* The parties also dispute Owner's obligation under the notes. Owner contends that it has an obligation to pay the notes back and that obligation "is actual and currently accruing." DSOF 23 (including response). Insurer disputes that fact on the ground that the underlying testimony was: "We have an obligation to pay, but not currently. It's accruing." *Id.* The parties dispute the nature of any obligation by Owner to repay any promissory note should it recover funds in this lawsuit. *See* DSOF 24 (including response).

---

[4]   There are different refences in the facts to Owner's "broker," Kell Holland. *See* PSOF 12 (including response). Holland is Owner's insurance agent. *See* Doc. 95 at 23. Owner disputes that Holland was working on its behalf or representing it, and that he "was simply voicing his professional concern over [Insurer's] position because he 'passionately' believed the loss should have been covered under the Policy." *See* PSOF 12 (including response).

As a result of the damage, at least some portion of the building was not fully tenantable for a period of time. DSOF 25 (including response).[5] The largest tenant in the building, CBOE, lost access to at least some of its space for some period of time. *See* DSOF 25-26. The parties dispute whether Owner has any obligation to abate rental payments made during that time. *See* DSOF 26-27 (including responses).

### B.     The Policy

The policy states that Insurer "will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." Doc. 86-16 at 60. "Covered Property" includes the building, as well as fixtures and permanently installed equipment. *Id.* "Property Not Covered" is also listed and identifies various things including "[u]nderground pipes, flues or drains." *Id.* at 61.

"Covered Causes of Loss means Risks of Direct Physical Loss unless the loss is" excluded under the "EXCLUSIONS" listed in the policy or limited in the "LIMITATIONS" section of the policy. *Id.* at 83. As relevant here, the policy states:

### B. EXCLUSIONS

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

    . . .

    **g. Water**

    **(1)** Flood, surface water, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body

---

[5] Insurer attempts to controvert this statement by stating that the largest tenant, CBOE, "could begin using the first floor as of August 19, 2022." *See* DSOF 25 (including response). The testimony cited was that the first floor was unusable until electrical work was completed on August 19, but that when the construction on the rebuild started, "[i]t really would have been pretty untenantable during all that because that was throughout the entire first floor." *See* Doc. 92-1 at 11 (White Dep. 34:12-36:3); *see also* Doc. 105-1 (email stating that electrical repairs finished on the 19th but "it may still be hard/unpleasant to run a business from there").

of water, or spray from any of these, all whether or not driven by wind (including storm surge);

**(2)** Mudslide or mudflow;

**(3)** Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;[6]

**(4)** Water under the ground surface pressing on, or flowing or seeping through:

    **(a)** Foundations, walls, floors or paved surfaces;

    **(b)** Basements, whether paved or not; or

    **(c)** Doors, windows or other openings; or

**(5)** Waterborne material carried or otherwise moved by any of the water referred to in Paragraph (1), (3) or (4), or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs g.(1) through (5) is caused by an act of nature or is otherwise caused.

However, if any of the above in Paragraphs g.(1) through (5), results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

*Id.* at 83-84. The Court refers to the language in section B.1.g. of the policy as the "Water

Exclusion." The policy contains additional exclusions:

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

. . .

**d.** **(1)** Wear and tear;

**(2)** Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

**(3)** Smog;

**(4)** Settling, cracking, shrinking or expansion;

**(5)** Insects, birds, rodents or other animals;

---

[6]  Paragraph (3) may have been changed by another portion of the policy. *See* Doc. 86-16 at 12. The parties don't discuss this change, and this paragraph is generally not at issue.

**(6)** Mechanical breakdown, including rupture or bursting caused by centrifugal force. However, if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision; or

**(7)** The following causes of loss to personal property:

**(a)** Dampness or dryness of atmosphere;

**(b)** Changes in or extremes of temperature; or

**(c)** Marring or scratching.

However, if an excluded cause of loss that is listed in **2.d.(1)** through **(7)** results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

. . .

**2.** "Specified causes of loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

. . .

**c.** Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam.

*Id.* at 85, 90-91. The Court refers to the language in B.2.d. above, along with the definition of "specified cause of loss" and "water damage," as the "Specified Cause of Loss Exception."

## C.    Litigation

Insurer filed this lawsuit on September 9, 2022. Insurer seeks declaratory judgment that the policy provides no coverage for the loss sustained on July 21, 2022. Doc. 84 at 18. This is based on Insurer's position that the Water Exclusion bars coverage. *Id.* Insurer also challenges Owner's ability to establish at least some of the claimed damages. *Id.* at 18-19.

8

Owner asserts two counterclaims. The first is breach of contract. *Id.* at 21. This is based on Owner's position that the Water Exclusion does not apply, that the policy provides coverage for the loss under the Specified Cause of Loss Exception, and that Insurer breached its obligation under the policy to pay for the loss. *Id.* at 21-22. Owner's second counterclaim is that Insurer engaged in unfair claim settlement practices as provided in K.S.A. § 40-2404(9), the Kansas Unfair Trade Practices Act. *Id.* at 22-23.

## II.     STANDARD

### A.     Summary Judgment

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In applying this standard, courts view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation and citation omitted).

Both parties move for summary judgment. The Court therefore views each motion separately in a light most favorable to the non-moving party. *See Sup. Ct. of N.M.*, 839 F.3d at 906-07. The denial of one motion does not require the grant of the other. *See id.* at 907.

### B.     Interpretation of Insurance Policies

Interpretation of an insurance policy is a question of law for a court to decide. *BancInsure, Inc. v. F.D.I.C.*, 796 F.3d 1226, 1233 (10th Cir. 2015). Courts should "consider the policy as a

whole, rather than viewing provisions in isolation." *Id.* Where the language is unambiguous, a court should enforce the contract as made. *Id.* Likewise, unambiguous language should be "construed in its plain, ordinary, and popular sense and according to the sense and meaning of the terms used." *Graves v. Am. Fam. Mut. Ins. Co.*, 686 F. App'x 536, 538 (10th Cir. 2017) (internal quotation and citation omitted). "When an insurance contract is not ambiguous, the court may not make another contract for the parties." *Liggatt v. Emps. Mut. Cas. Co.*, 46 P.3d 1120, 1127 (Kan. 2002) (internal quotation and citation omitted).

Ambiguity occurs where a policy "contain[s] provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." *Corp. Lakes Prop., LLC v. AmGuard Ins. Co.*, 649 F. Supp. 3d 1143, 1147 (D. Kan. 2023). Ambiguity is judged by what a reasonably prudent insured would understand the language to mean. *Id.* But a court should not "strain to find an ambiguity where common sense shows there is none." *Miller v. Great Am. Ins. Co.*, 601 F. Supp. 3d 953, 962 (D. Kan. 2022) (internal quotation and citation omitted). Nor does a disagreement in interpretation render a policy ambiguous. *See id.* If a policy is ambiguous, it should be interpreted in favor of the insured. *BancInsure, Inc.*, 796 F.3d at 1233.

An insured has the burden to establish coverage under a policy, while the insurer has the burden to show coverage is excluded. *Corp. Lakes Prop., LLC*, 649 F. Supp. 3d at 1148. Exclusions are generally construed narrowly. *See id.*

## III.    ANALYSIS

### A.    Declaratory-Judgment Claim and Breach-of-Contract Counterclaim Regarding Coverage

The Court first considers Insurer's claim for declaratory judgment that the policy provides no coverage based on the Water Exclusion, and Owner's related counterclaim for breach of

contract. Typically, the party asserting the claim has the burden of establishing that claim. This burden is somewhat modified in this case, which involves coverage under an insurance policy.

An insured has the burden to establish coverage under a policy, while the insurer has the burden to show coverage is excluded. *Id.* The parties agree the policy provides coverage unless a specific exclusion applies. The underlying dispute in both claims is whether the loss is excluded under the Water Exclusion. The burden of establishing that the Water Exclusion applies therefore falls on Insurer, whether in the context of Owner's breach-of-contract claim or Insurer's declaratory-judgment claim. *Id.*[7]

### 1.    Applicability of the Water Exclusion

#### a.    Insurer has shown that the Water Exclusion Applies.

Insurer seeks summary judgment on its declaratory-judgment claim that the Water Exclusion bars coverage for the loss. Doc. 92 at 15. The Court starts with the language of the Water Exclusion. The policy states Insurer "will not pay for loss or damage caused directly or indirectly by . . . [w]ater under the ground surface pressing on, or flowing or seeping through: (a) [f]oundations, walls, floors or paved surface; (b) [b]asements, whether paved or not; or (c) [d]oors, windows or other openings." Doc. 86-16 at 83-84. This exclusion applies regardless of whether it "is caused by an act of nature or is otherwise caused." *Id.* at 84.

Here, it is undisputed that the break in the pipe was located underneath the building. DSOF 9 (including response). The parties won't agree to use the word "underground," but it is undisputed that the pipe was several feet under the floor of the building and that accessing the pipe required

---

[7]    As indicated, the Court has considered each motion independently. But similar if not identical arguments are raised by both sides in each set of briefing, so the analysis overlaps considerably. The Court remains mindful throughout that Insurer has the burden of establishing that the Water Exclusion applies.

several feet of excavation[8] as well as removal of the concrete floor, dirt, clay, and rocks. PSOF 6-7. Owner described the pipe as "directly under the building." PSOF 22.

It is also undisputed that the building sustained damage after the pipe broke. Water escaped the broken pipe and caused damage to the building's entire first floor. DSOF 6. The parties seemingly disagree whether the water from the pipe "seeped up." But Insurer cites testimony indicating that water was observed coming from under doors, Doc. 92-1 at 6 (White Dep. 14:3-14), that there was three inches of water on the floor, *id.* (White Dep. 15:13-22), that water was in the building when a pipe under the concrete slab broke, *id.* at 7 (White Dep. 18:9-24), that "[t]here was a huge hole in the ground where the water had blew out" and excavation was needed to make the repairs, Doc. 92-2 at 4 (Quirk Dep. 11:19-12:2), and that a photo showed "where the water came out of the floor," *id.* at 5 (Quirk Dep. 14:1-8). Although Owner argues there was no evidence that water "seeped up," Owner cites deposition testimony that includes the statement that "[t]here was a huge hole in the ground where the water had blew out," Doc. 86-4 at 4. Quirk also testified that "the floor had heaved" when the pipe broke. *See id.*

Although the parties may dispute the use of the word "seeped," it is undisputed that the broken pipe was under the surface of the ground, that water escaped the broken pipe under the surface of the ground, and that water then traveled above the surface of the ground and throughout the first floor of the building. Merriam-Webster defines the verb "seep" as "to flow or pass slowly through fine pores or small openings," "to enter or penetrate slowly," or "to become diffused or spread." *See* https://www.merriam-webster.com/dictionary/seep. The Water Exclusion also applies to water "pressing on" or "flowing . . . though." Doc. 86-16 at 84. The facts above fall

---

[8]   Quirk, the plumber who did the repairs, testified that they had to dig seven feet with an excavator. PSOF 6 (citing Quirk Dep. 17:14-20).

squarely within the situation encompassed by the Water Exclusion under the plain meanings of these terms. *See Secura Ins. v. 33 Allenton Venture, L.L.C.*, 985 N.W.2d 109, 115 n.5 (Wis. Ct. App. 2022) ("[T]he water in the subsurface soil did not simply remain in the soil but it successfully flowed/seeped through the foundation, walls, floors, and/or basement."). There are no facts suggesting the water from the pipe entered the building some other way. In sum, every reasonable jury would conclude that the Water Exclusion was applicable.[9]

Owner argues there is a genuine issue of fact as to the applicability of the Water Exclusion "with respect to whether the pipe that burst was a part of the building's fire suppression system, was inside the footprint of the building, was a part of the building's infrastructure, and was, therefore, not 'under the ground surface.'" Doc. 103 at 10-12. But it is not clear how the pipe's relationship to the fire suppression system, infrastructure, or building footprint creates a dispute of fact as to whether the pipe (and therefore the water it spilled) was under the ground surface. As discussed below, nothing in the language of the Water Exclusion suggests it is inapplicable to water originating in a building's fire suppression or plumbing system or from pipes that are within the footprint of the building. To the contrary, and as discussed below, the Water Exclusion states that it applies to water under the ground surface that "is caused by an act of nature <u>or is otherwise caused</u>." Doc. 86-16 at 84. Based on this plain language, the fact that the water originated in the building's fire suppression system would not negate application of the Water Exclusion, nor raise a genuine question of fact as to its applicability. Nor does Plaintiff cites any caselaw that would render these facts material to the determination of whether the Water Exclusion applies.[10]

---

[9]   Owner makes arguments that the Water Exclusion is limited or ambiguous, which the Court addresses below.

[10]   The parties both discuss *Corporate Lakes Property, LLC v. AmGuard Insurance Co*. There, an "underground pipe on the premises but outside of the building perimeter allowed water to escape from the pipe below the surface of the ground, rise to the ground surface and flow over the ground surface into a basement window well." *Corp. Lakes Prop., LLC*, 649 F. Supp. 3d at 1145-46. The policy had an exclusion that was nearly identical to the Water Exclusion in this case. *Id.* at 1146. The Court found that a different subsection of that exclusion applied—one

In sum, Insurer has carried its burden of showing that the undisputed facts of this case fall within the Water Exclusion. Owner has not raised any genuine issue of fact on this point that a reasonable jury could rely on to find that the Water Exclusion did not apply.

> **b.** **Because the Water Exclusion applies, the Anti-Concurrent Cause Provision renders the Specified Cause of Loss Exception immaterial.**

Insurer argues that language in the policy regarding concurrent causes of loss bars any coverage under the Specified Cause of Loss Exception. Doc. 92 at 20-22. The language at issue is found at the start of the list of exclusions. It states that Insurer "will not pay for loss or damage caused directly or indirectly by any of the following.[11] Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss." Doc. 86-16 at 83. The Court refers to this provision as the "Anti-Concurrent Cause Provision."

Courts have explained that the purpose of such provisions is to allow an insurer to make clear that there is no coverage where an excluded cause of loss contributes to damage, even if a covered cause of loss also contributes to the damage. *Ski Chalet Vill. Owners Club, Inc. v. Emps. Mut. Cas. Co.*, 2016 WL 6892759, at *3 (E.D. Tenn. 2016) ("Typically, there is insurance coverage where an excluded cause of loss and a covered cause combine to cause damage. . . . An insurer may contract around that possibility, however, through use of an 'anti-concurrent cause provision,' such that there is no coverage for damage that is caused in any manner by an excluded cause regardless of any other concurring or contributing causes."); *see also Thurston Foods, Inc. v.*

---

relating to surface water. *Id.* at 1149-51. It rejected application of the "water under the ground surface" subsection, but only because the water had traveled along the surface before entering the building. *Id.* at 1151 ("Based on this understanding of surface water in subpart one, a reasonably prudent insured would understand subpart four of the water exclusion to apply only if at the time the water entered the building, it was under the ground surface."). Contrary to Owner's argument, the fact that the pipe at issue was outside the perimeter of the building did not factor in the analysis one way or the other.

[11] The Water Exclusion is one of the listed exclusions.

*Wausau Bus. Ins. Co.*, 2019 WL 2075880, at *3 (D. Conn. 2019) ("Generally, anti-concurrent cause provisions are interpreted to mean that where a loss results from multiple contributing causes, coverage is excluded if the insurer demonstrates that any of the concurrent or contributing causes of loss are excluded by the policy."). At least one court has declared a clause identical to the one in this case to be "clear and unambiguous" *See Ark. Valley Drilling, Inc. v. Cont'l W. Ins. Co.*, 703 F. Supp. 2d 1232, 1241 (D. Colo. 2010).[12]

Here, the policy makes clear that Insurer will not pay for loss or damage caused "directly or indirectly" by water under the ground surface that presses, flows, seeps into a building <u>even if</u> "any other cause or event . . . contributes concurrently or in any sequence to the loss." *See* Doc. 86-16 at 83. Put another way, if the Water Exclusion applies, Insurer does not have to pay for that damage <u>even if</u> Owner can demonstrate that the damage also falls within the Specified Cause of Loss Exception. *See Ark. Valley Drilling, Inc.*, 703 F. Supp. 2d at 1239 ("Under the plain meaning of the language of the concurrent or sequential cause provision, paragraph B.1., however, the losses caused by water under the surface of the ground are not covered by the Policy even if the rupture of the frozen indoor water pipe was the initial event or a concurrent event that contributed to the water under the surface of the ground."). As discussed above, the Water Exclusion applies. Coverage for the loss is therefore excluded even if the Specified Cause of Loss Exception also applied. The applicability of the Specified Cause of Loss Exception is therefore immaterial.[13]

---

[12] Owner does not argue that the Anti-Concurrent Cause Provision is ambiguous.

[13] There is a disputed question of fact as to whether the Specified Cause of Loss Exception applies. The parties disagree on the relationship of the pipe to the fire suppression system and whether it would be considered "on the described premises." The same is true for Insurer's argument that Owner has no evidence that the pipe failed due to rust or corrosion, which is the subject of a *Daubert* motion. *See* Doc. 88. However, these disputes are not material in light of the Anti-Concurrent Cause Provision.

Owner argues that the Anti-Concurrent Cause Provision is not applicable because "there is only one, singular cause of the all the water damage to [the] property," namely, the broken pipe. Doc. 95 at 24-27.[14] Another court has considered and rejected a near identical argument:

> The insureds go so far as to assert that there "was only one cause of the Covered Premises Damage"—"a water pipe under the office building broke apart." We disagree. Clearly, the damage at issue would not have occurred if the pipe had not broken apart; thus, that was "a" cause of the damage. But there can be no dispute that the continued flowing of water through the pipe after it had failed and that water escaping from the pipe into the surrounding subsurface soil also was a cause of the damage. Had the failure of the pipe been timely detected and the water flowing through it immediately shut off, for example, there would not have been any damage to the building or its contents. That did not happen. Then, the water in the subsurface soil did not simply remain in the soil but it successfully flowed/seeped through the foundation, walls, floors, and/or basement. Had the escaping water not succeeded in penetrating into the building, there would have been either no damage or much more limited damage. Without all three of these causes and/or events occurring, the insureds would not have sustained their damages.

*Secura Ins.*, 985 N.W.2d at 115 n.5. The same series of circumstances occurred here. The pipe under the building broke, water escaped the pipe under the ground surface, and that water infiltrated the building. Thus, it is not correct to simply state that damage was solely caused by the breaking apart of the pipe, as Owner suggests. And because there were multiple causes of the damage, including water under the ground surface entering the building—an excluded cause of loss—the Anti-Concurrent Cause Provision applies and precludes coverage under the Specified Cause of Loss Exception.[15]

---

[14] Owner also argues that the Anti-Concurrent Cause Provision doesn't apply because Insurer is only relying on the Water Exclusion, as opposed to several exclusions. Doc. 95 at 26. This seems to misunderstand Insurer's position. Insurer is relying on the Water Exclusion, and arguing in response to Owner's position that the Anti-Concurrent Cause Provision bars any <u>coverage</u> under the Specified Cause of Loss Exception. An Anti-Concurrent Cause Provision is only relevant when there is both a covered and an excluded cause of loss, not when there are two excluded causes of loss. *See Ski Chalet Vill. Owners Club*, 2016 WL 6892759, at *3.

[15] Owner advocates application of a "cause" test to conclude that the breaking apart of the pipe was the sole cause of loss. Doc. 95 at 24-25. Owner argues this "cause" test is used to determine whether there was a single cause or multiple causes of loss, and that the test asks whether there was "one proximate, uninterrupted and continuing

### c.      The Water Exclusion is not ambiguous.

Owner argues that the Water Exclusion is ambiguous and that it must therefore be read in Owner's favor. As explained above, ambiguity occurs where a policy "contain[s] provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." *Corp. Lakes Prop., LLC*, 649 F. Supp. 3d at 1147.

The Court understands Owner to argue that the Water Exclusion is ambiguous in three ways, though the arguments are all somewhat similar or overlapping. The first way Owner contends the Water Exclusion is ambiguous is that an average lay person would not understand "water under the ground surface" to include water coming from a pipe associated with the building given that other sources of water listed in the exclusion are of a natural origin or do not originate with the building. The second is that an average lay person would not expect the Water Exclusion to apply to water from broken pipes because it does not specifically reference water from broken pipes that are associated with the building. Third, Owner argues the Water Exclusion is ambiguous because it does not define "ground" or "surface" and therefore a reasonable interpretation is that it only applies to water under the "undisturbed" earth.[16] Each argument is addressed in turn.

---

cause resulting in all of the claimed damages." *Id.* (citing *N. River Ins. Co. v. Huff*, 628 F. Supp. 1129 (D. Kan. 1985)). Owner's analysis on this point is slim and not persuasive. First, as discussed above, the loss to the building was not caused only by the breaking apart of the pipe. It was the subsequent movement of the water into the building that caused Plaintiff's loss. Second, the "cause" test Owner advocates was developed to determine "the number of occurrences in the context of a policy of insurance." *N. River Ins. Co.*, 628 F. Supp. at 1133 (considering whether multiple loan transactions should be considered separate occurrences under an insurance policy, or whether it was only one occurrence under a widespread loan-swap program); *see also Atchison, Topeka & Santa Fe Ry. Co. v. Stonewall Ins. Co.*, 2000 WL 33996655, at *6 (Kan. Dist. Ct. 2000) (determining whether loss should be measured by multiple, individual instances of hearing loss by railroad workers or by the singular failure of railroad to institute a hearing conservation program); *Champion Int'l Corp. v. Cont'l Cas. Co.*, 546 F.2d 502, 505 (2d Cir. 1976) (determining whether the 1400 individual installations of defective panels were distinct occurrences, or whether the overall delivery of defective panels was a single occurrence). The cases cited by Owner to advocate use of the "cause" test are not factually analogous to the issues in this case.

[16] Owner also argues that because both it and its insurance agent "reasonably interpreted the [Water Exclusion] as not applying to this type of loss, the [Water Exclusion] remains ambiguous under the uncontroverted facts." Doc. 95 at 23. But ambiguity is not judged based on what the insured and insurance agent think, but on what a reasonably prudent insured would understand the language to mean. *See Corp. Lakes Prop., LLC*, 649 F. Supp. 3d at 1147;

First. Owner first argues that when read as a whole, i.e. in conjunction with the other subparts of the Water Exclusion, "the average lay person" would not interpret "water under the ground surface" to include "water in a pipe on the premises for the building's fire suppression system" given that other provisions in the Water Exclusion refer to things such as "flood, surface water, tides, tidal water, overflow, [and] mudslide," which "originate[] from sources entirely unrelated to the insured premises." Doc. 95 at 19-21.

Owner is correct that the Water Exclusion covers some sources of water that originate from natural sources, like tsunami, tidal water, or mudslides. But, as Owner acknowledges, *see id.* at 21, the same cannot be said for all sources of water listed. For example, the Water Exclusion applies to water from sewers, drains, sump pumps, or related equipment that are often part of the infrastructure of a building.[17] In other words, the plain language of the Water Exclusion extends to both natural sources of water and sources of water linked to the building.

This understanding is reinforced by the use of the term "water" in the Water Exclusion. The Water Exclusion only refers to "water under the ground surface," not "groundwater," "subsurface water," or some other term that might carry a more specific connotation.[18] Courts have

---

*see also Miller*, 601 F. Supp. 3d at 962 (stating that disagreement in interpretation does not render a policy ambiguous).

[17] As noted above, the parties have amended paragraph 3 of the Water Exclusion. *See* Doc. 86-16 at 12. Owner does not argue that any such amendment alters the interpretation of the "water under the ground surface" subparagraph. Owner in fact cites to the original language in its own motion, somewhat conceding the point that the exclusion is not limited to natural sources of water. *See* Doc. 95 at 21 ("Importantly, other than sewer or drain backup, each type of water listed in the 'Water' exclusion—flood, surface water, tides, tidal water, overflow, mudslide, and even water under the ground surface—originates from sources entirely unrelated to the insured premises." (emphasis added)). Owner's concession on this language—that the exclusion does reference a source of water connected to the insured premises—undercuts Owner's argument that the Water Exclusion was only meant to apply to sources of water completely unrelated to the building. Nor is the Court persuaded by Owner's argument that the reference to sewers or drains but not pipes indicates the Water Exclusion does not apply here. Owner argues that if Insured "wanted to exclude water from pipes carrying water to the premises, it easily could have." *Id.* at 22. But the issue is not whether Insurer wanted to exclude water from pipes, but whether its exclusion of "water under the ground surface . . . caused by an act of nature or . . . otherwise caused" is ambiguous. Doc. 86-16 at 84. Given this broad wording in the exclusion, the failure to specifically list pipes does not render it ambiguous.

[18] Black's Law Dictionary contains several entries related to types of water. "Surface water" is defined as "[w]ater lying on the surface of the earth but not forming part of a watercourse or lake." "Subterranean water" is defined as

rejected attempts to read unwritten limits into similar policy exclusions. *See Corp. Lakes Prop., LLC*, 649 F. Supp. 3d at 1149-50 (finding that the "surface water" provision just means "uncontained water on the surface, whether the source of that water is from a natural, man-made or unknown source");[19] *Bull v. Nationwide Mut. Fire Ins. Co.*, 824 F.3d 722, 725 (8th Cir. 2016) ("The relevant language states simply 'water or water-borne material below the surface of the ground.' The phrase cannot be limited to naturally occurring water, as contrasted with water from a pipe, without grafting onto the phrase an unwritten, implicit limitation."); *Wisteria Properties LLC*, 2021 WL 6882154, at *4 ("The Court agrees with Ohio Security that a plain reading of the Water Exclusion Endorsement shows that any water under the ground surface, rather than only natural water or ground water or subterranean water, seeping through the foundations is precluded from coverage."); *Thompson v. State Farm Fire & Cas. Co.*, 165 P.3d 900, 902 (Colo. App. 2007) ("The plain language of the policy excludes any loss from water below the surface of the ground that leaks through a foundation, regardless of cause and regardless of whether or not the water arises from natural or external forces."); *see also Krug v. Millers' Mut. Ins. Ass'n of Ill.*, 495 P.2d 949, 955 (Kan. 1972) ("Here the water which leaked from the broken water line was water below the surface of the ground within the meaning of the exclusion.").

---

"[w]ater that lies or flows beneath the earth's surface and that is not artificially confined." "Groundwater" is defined as "[w]ater found in layers of permeable rock or soil." *See generally* Black's Law Dictionary (12th ed. 2024). As explained above, the policy refers only to "<u>water</u> under the ground surface," which suggests no specific type of water was contemplated. *See Wisteria Properties LLC v. Ohio Sec. Ins. Co.*, 2021 WL 6882154, at *4 (C.D. Cal. 2021).

[19] Owner notes that the policy in *Corporate Lakes* included an example that suggested the water exclusion there was intended to apply to water in "containment systems," and that there is no similar example in the policy here. Doc. 103 at 11. Owner is correct that there was such an example in the policy in *Corporate Lakes*. 649 F. Supp. 3d at 1150 ("In addition, the Policy cites an example of when the water exclusion applies, which supports an interpretation that the source of the surface water is immaterial."). But the example was not dispositive. It only was cited to "reinforce[]" the notion that a reasonably prudent insured would interpret "surface water" to include all water on the surface, regardless of its source. *Id.* at 1149-50.

True, some courts have limited similar provisions to "natural" sources of water, as opposed to water from a pipe. *See, e.g.*, *Broome v. Allstate Ins. Co.*, 241 S.E.2d 34, 35 (Ga. Ct. App. 1977) ("Standing alone, subsection (c) would appear to apply to the situation at hand. However, reading it in conjunction with subsections (a) and (b), it is more reasonable to construe the exclusion as applying only to natural flooding as opposed to flooding caused by artificial means."); *Varela v. State Farm Gen. Ins. Co.*, 555 F. Supp. 3d 983, 991 (E.D. Cal. 2021) ("Quite simply, a lay person would not understand water from a broken plumbing pipe to be akin to 'water within the earth that supplies wells and springs.'"); *see also* Couch on Insurance, § 153:58 (3d ed. 2024) ("There is, however, some dispute over whether the exclusion encompasses only underground water from natural sources, such as precipitation, or extends to water from artificial sources, such as broken pipes.").[20] But the Court finds no grounds to read any such distinction in the plain language of the Water Exclusion in this case.

<u>Second</u>. Owner's second argument that the Water Exclusion is ambiguous is because it "makes no reference to water from broken pipes supplying water to the premises or its building." Doc. 95 at 21-22. According to Owner, because it does not reference "water escaping from a broken underground pipe on the premises providing water to the building, a lay person reading that exclusion would not expect it to apply to that situation." *Id.*[21]

---

[20]   Owner relies in part on two cases to argue that courts have refused to extend the Water Exclusion to water originating within the building's infrastructure. Doc. 107 at 7-9. The cases cited are distinguishable. In *Auto-Owners Insurance Co. v. United Way*, the exclusion at issue was for "flood, surface water, waves, tides, tidal waves, storm surge, overflow of any body of water, or their spray," and the analysis turned on the common definitions of flood, which referred to an overflowing body of water, not a burst pipe. *Auto-Owners Ins. Co. v. United Way of E. Cent. Ala.*, 497 F. Supp. 3d 1115, 1120-21 (N.D. Ala. 2020). *Auto-Owners* rejected application of the "water under the ground surface" exclusion in that case, but only because the water at issue flowed above the ground surface and was therefore never "under the ground surface." *Id.* at 1123-24. *Auto-Owners* did not hold that the "water under the ground surface" exclusion was inapplicable because the water came from a pipe. Owner also relies on *Comely v. Auto-Owners Insurance Co.*, for the same proposition. But there, too, the court's holding was limited to construction of the "flood" exclusion, and it only rejected application of the "water below the surface" because the water at issue flowed above the surface. 563 S.W.3d 9, 11-12 (Ky. 2018).

[21]   As noted above, there is overlap between this argument and Owner's first argument regarding ambiguity.

This argument ignores language in the second-to-last paragraph of the Water Exclusion. The Water Exclusion states that it applies whether the water "is caused by an act of nature <u>or is otherwise caused</u>." Doc 86-16 at 84. A reasonable person would not read this broad, inclusive language and conclude that certain sources of water are excluded because they are not specifically listed. *See Corp. Lakes Prop., LLC*, 649 F. Supp. 3d at 1150 ("Indeed, the exclusion states that it 'applies regardless of whether any of the above [types of water described] in Paragraphs (1) through (5), is caused by an act of nature or is otherwise caused.'"); *Wisteria Props. LLC*, 2021 WL 6882154, at *4 ("In fact, the clarification that the 'exclusion applies regardless of whether . . . [water under the ground surface seeping through the foundations] is caused by an act of nature or is otherwise caused' confirms that the term unambiguously refers to all types of water, natural or otherwise."); *Citi Gas Convenience, Inc. v. Utica Mut. Ins. Co.*, 2016 WL 492474, at *4 (E.D. Pa. 2016) ("The water exclusion states that it 'applies regardless of whether any of the above in Paragraphs 1. through 5., is caused by an act of nature or is otherwise caused.'"); *see also Secura Ins.*, 985 N.W.2d at 114 ("Here, the pressing/flowing/seeping water was caused 'otherwise' than by an act of nature—i.e., the continuing flow of water after a pipe under the building failed.").

<u>Third</u>. Owner's third argument is that the Water Exclusion is ambiguous because it does not define the term "ground" or "surface" and therefore a reasonable interpretation is that it only "excludes water beneath the <u>undisturbed</u> earth . . . that existed before any grading, excavating, filling or construction took place." Doc. 95 at 22-23 (emphasis added). The Court disagrees that the failure of the policy to define the words "ground" and "surface" renders the Water Exclusion ambiguous. Courts interpreting a policy should not "strain to find an ambiguity where common sense shows there is none." *Miller*, 601 F. Supp. 3d at 962. Further, "[a] word in an insurance

policy is not ambiguous simply because it is undefined." *Davis-Travis v. State Farm Fire & Cas. Co.*, 336 F. App'x 770, 774 (10th Cir. 2009).

The Water Exclusion applies to "water under the ground surface." A reasonably prudent insured would interpret this to mean just what it says.[22] Nothing about this language suggest that it can only apply to water that is a certain degree below the ground surface, i.e., below grading, excavating, filling, or construction. Further, limiting the Water Exclusion to "water beneath the undisturbed earth" would exclude many sources of water below the surface, which conflicts with the language of the Water Exclusion, as discussed above.

In sum, the Court finds that the Water Exclusion is not ambiguous.

> **d.     There is no "conflict ambiguity" between the Water Exclusion and the Specified Cause of Loss Exception.**

Owner separately argues that there is a "conflict ambiguity" between the Water Exclusion and the Specified Cause of Loss Exception that must be resolved in favor of coverage. Doc. 95 at 27-29. The Court discerns this to be an argument that an ambiguity exists because the facts of this case ostensibly fall under two competing policy provisions, one that provides coverage and one that does not.

According to Owner, because the Specified Cause of Loss Exception does not reference any policy exclusions, "it is reasonable to expect that 'specified cause of loss' would be a distinct set of causes that are covered without regard to other exclusions." *Id.* at 29. But this ignores the Anti-Concurrent Cause Provision, discussed above. Moreover, Owner's argument misconstrues the relationship between the Water Exclusion and the Specified Cause of Loss Exception. They do

---

[22]   Merriam-Webster defines "ground" as "the surface of a planet . . . especially: the surface of the earth or a particular part of it sometimes as contrasted with the air or sea." *See* https://www.merriam-webster.com/dictionary/ground. Surface is defined as "the exterior or upper boundary of an object or body." *See* https://www.merriam-webster.com/dictionary/surface. Read together as they are used in the policy, "ground surface" refers to the upper boundary of the surface of the earth. The pipe here was at least seven feet below that.

not apply in an either/or sense. The Water Exclusion excludes certain causes of loss. The "wear and tear" provision separately excludes causes of loss attributable to wear and tear (or rust or corrosion) <u>unless</u> it results in a "specified cause of loss." In that case, the "specified cause of loss" would not be excluded under the "wear and tear" exclusion (hence the Specified Cause of Loss <u>Exception</u> to the "wear and tear" <u>exclusion</u>). But the Specified Cause of Loss Exception is <u>not</u> an exception to the Water Exclusion and therefore does not impact its application. "Stated differently, assuming the exception to the wear and tear exclusion makes that exclusion inapplicable so that coverage is not excluded thereunder, that is the limit of the exception's impact; it does nothing to undermine the fact that the water exclusion excludes coverage for the damage at issue." *Secura Ins.*, 985 N.W.2d at 115-16 (noting that an exception to an exclusion cannot create coverage if a different exclusion applies); *see also Midwest Fam. Mut. Ins. Co. v. Hari Om Rudra Hotel, LLC*, 416 F. Supp. 3d 853, 865 (W.D. Mo. 2019) ("[A]n exception to an exclusion does not create coverage, particularly where, as here, the contract includes language that unambiguously intends to exclude damages where there are multiple causes of the loss."); *Wisteria Props. LLC*, 2021 WL 6882154, at *6 ("The effect of the Water Exclusion is not vitiated simply because another exclusion is limited by an exception." (internal quotation and citation omitted)). Both provisions could therefore factually apply, but coverage would still be excluded under the Water Exclusion.

Beyond that, the Court does not discern a conflict between Water Exclusion and the Specified Cause of Loss Exception such that the policy is rendered ambiguous. The two provisions are not necessarily in conflict. Broken pipes that lead to water damage may be a covered cause of loss in certain circumstances under the Specified Cause of Loss Exception, as long as the damage does not fall within any other policy exclusions, including the circumstances listed in the Water Exclusion. But if a pipe breaks and causes water to flow, seep, or press up from under the ground

surface, that is an excluded loss under the terms of the Water Exclusion. This is not a conflict. It is simply different circumstances for which losses are covered or excluded. *See Midwest Fam. Mut. Ins. Co.*, 416 F. Supp. 3d at 864 ("Hari Om responds that the underground water exclusion is ambiguous, and the policy would virtually never provide coverage for plumbing systems, as nearly all plumbing is underground. The Court notes that Hari Om's proposition that nearly all plumbing is underground is dubious at best, as many plumbing systems are contained within buildings themselves and connect to fixtures which are above ground.").

Owner relies on *Cameron v. Scottsdale Insurance Co.*, 726 F. App'x 757 (11th Cir. 2018), to argue that courts have awarded coverage based on the conflict between a water exclusion and a "water damage" grant of coverage. Doc. 95 at 29. Owner states that *Cameron* held that "the 'water damage' exception to the 'Wear and Tear' exclusion barred the application of the 'Water' exclusion." *Id.* But what *Cameron* actually held was that the water exclusion in that case only applied to water "caused by outside forces unrelated to the residence premises' plumbing system." *Cameron*, 726 F. App'x at 762. The Court has rejected such a distinction here.[23]

Owner also cites but does not discuss *Spring Glen Apartments LLP v. Arch Specialty Insurance Co.*, 307 F. Supp. 3d 975 (D.N.D. 2018). *See* Doc. 95 at 29. The policy in that case contained a similar water exclusion and "specified cause of loss" exception. But the policy in *Spring Glen* had a provision that stated: "To the extent that accidental discharge or leakage of water falls within the criteria . . . of this definition of 'specified causes of loss,' such water is not subject to the provisions of the Water Exclusion which preclude coverage for surface water or

---

[23] This holding was based in part on the fact that some water sources in the water exclusion were of an outside or natural origin, and thus the court in *Cameron* read all sources in the water exclusion with that lens. *Cameron*, 726 F. App'x at 762. The policy in *Cameron* also include an explanatory provision to "help determine when the Water Exclusion applies." *Id.* That provision provided examples of "weather-induced flooding" that would trigger the water exclusion in that case. *Id.* There is no similar language here, and the Court has found the Water Exclusion is not limited to natural sources of water.

water under the surface of the ground." 307 F. Supp. 3d at 983. In other words, the policy specifically stated that the water exclusion did not apply if the "specified cause of loss" exception applied. No similar language is found in the policy in this case. *See* Doc. 86-16 at 91.

In sum, there is no "conflict ambiguity" between the Water Exclusion and the Specified Cause of Loss Exception.

### 2. Summary of Ruling on Declaratory-Judgment and Breach-of-Contract Claim

Insurer has demonstrated that the Water Exclusion applies to the undisputed material facts of the case. The Anti-Concurrent Cause Provision provides that coverage is excluded if the Water Exclusion applies <u>even if</u> a covered cause of loss also applies. Therefore, it is immaterial whether the Specified Cause of Loss Exception applies. The Water Exclusion is not ambiguous and is not in conflict with the Specified Cause of Loss Exception.

Based on this analysis, the Court grants Insurer summary judgment on its declaratory-judgment claim. For the same reasons, the Court also grants Insurer summary judgment on Owner's breach-of-contract counterclaim because Insurer has shown that the loss was excluded under the policy, and therefore it has not breached the contract.

### B. Owner's Kansas Unfair Trade Practice Act Counterclaim

Owner counterclaimed against Insurer for violation of the Kansas Unfair Trade Practice Act ("KUTPA") alleging that Insurer engaged in unfair claim settlement practices. *See* Doc. 84 at 22-23 (citing K.S.A. § 40-2404(9)). Insurer moves for summary judgment on this claim because the KUTPA does not create a private cause of action and because the facts don't demonstrate that Insurer engaged in any unfair practices where it properly denied coverage. *See* Doc. 92 at 26-29.

Owner does not respond to this argument, nor does it address this claim in its own motion. Based on this, it appears Owner concedes this claim is subject to summary judgment in favor of

Insurer. *See Spencer v. Diversicare of Sedgwick, LLC*, 2022 WL 2438387, at *7 (D. Kan. 2022) ("The Court construes Plaintiff's failure to respond as a concession that these claims are subject to dismissal."). Even if Owner's failure to respond is not construed as a concession, Insurer is correct that there is no private cause of action under KUTPA. *See Wichita Firemen's Relief Ass'n v. Kansas City Life Ins. Co.*, 237 F. Supp. 3d 1135, 1143 (D. Kan. 2017). Further, to the extent Owner's KUTPA claim is based on Insurer's failure to pay under the policy or for issuing an ambiguous policy, the Court has found Insurer properly excluded coverage under the Water Exclusion and the policy is not ambiguous.

Accordingly, the Court grants summary judgment to Insurer on Owner's counterclaim for unfair claim settlement practices.

## IV.   CONCLUSION

Insurer is entitled to summary judgment on its declaratory-judgment claim because Insurer has shown on the undisputed facts that the loss was excluded under the policy. Put another way, every reasonable jury would find on the undisputed facts that the damage to the building was caused by water under the ground surface pressing, flowing, or seeping into the building. Insurer is also entitled to summary judgment on Owner's breach-of-contract counterclaim for the same reason.

Insurer is entitled to summary judgment on Owner's counterclaim under KUTPA because Owner has not responded to Insurer's motion for summary judgment on this claim and therefore concedes the issue, and because there is no private cause of action under KUTPA.

THE COURT THEREFORE ORDERS that Insurer's Motion for Summary Judgment (Doc. 91) is GRANTED. Insurer is entitled to summary judgment on its declaratory-judgment

claim, as well as on Owner's counterclaims for breach of contract and violation of KUTPA. The Clerk of Court is directed to enter judgment in favor of Insurer, who is Plaintiff in this matter.

THE COURT FURTHER ORDERS that Owner's Motion for Summary Judgment (Doc. 85) is DENIED.

THE COURT FURTHER ORDERS that Insurer's Motion to Exclude Certain Opinions of Defendant's Non-Retained Experts Bob Quirk and Brandon McKinney (Doc. 88) is DENIED AS MOOT and WITHOUT PREJUDICE.

IT IS SO ORDERED.

Dated: July 29, 2024                          /s/ *Holly L. Teeter*
                                              HOLLY L. TEETER
                                              UNITED STATES DISTRICT JUDGE